# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2024
No. 22-6077

**DHARWINDER SINGH,**
*Petitioner*,

v.

**PAMELA BONDI, UNITED STATES ATTORNEY GENERAL,**
*Respondent*.[*]

On Petition for Review of an Order
of the Board of Immigration Appeals

ARGUED: FEBRUARY 24, 2025
DECIDED: JUNE 3, 2025

Before:     RAGGI, MENASHI, and PÉREZ, *Circuit Judges*.

Petitioner Dharwinder Singh petitions for review of an order of the Board of Immigration Appeals that affirmed the order of an

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Pamela Bondi is automatically substituted for former Attorney General Merrick B. Garland as the respondent.

Immigration Judge denying his application for asylum, withholding of removal, and relief under the Convention Against Torture. Singh argues that the agency erred by making an adverse credibility determination based solely on an inconsistency between his hearing testimony and his statements during his border interview. Singh acknowledges the inconsistency but claims that the agency failed to evaluate the reliability of the border interview under the standards identified in *Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir. 2004).

Before Congress enacted the REAL ID Act in 2005, our court required the agency to evaluate a border interview using the *Ramsameachire* factors. The BIA has subsequently held that the totality-of-the-circumstances standard Congress adopted in 8 U.S.C. § 1158(b)(1)(B)(iii) displaces the judge-made requirement that previously applied. We agree with the BIA about the effect of the REAL ID Act. Thus, while the *Ramsameachire* factors may be appropriate for the agency to consider as part of the totality-of-the-circumstances inquiry that § 1158(b)(1)(B)(iii) requires, those factors are not independently controlling. In this case, because the agency considered the argument that Singh raised about the reliability of the border interview, it properly relied on the interview to make an adverse credibility determination. Accordingly, we deny the petition for review.

Judge Pérez concurs in the judgment in a separate opinion.

---

JATINDER S. GREWAL, East Elmhurst, NY (Anas J. Ahmed, Jackson Heights, NY, *on the brief*), *for Petitioner*.

BRANDON T. CALLAHAN, Trial Attorney, Office of Immigration Litigation (Brian M. Boynton, Principal

Deputy Assistant Attorney General, Civil Division; Jennifer P. Levings, Assistant Director, Office of Immigration Litigation, *on the brief*), United States Department of Justice, Washington, DC, *for Respondent*.

---

MENASHI, *Circuit Judge*:

Petitioner Dharwinder Singh, a citizen of India, petitions for review of an order of the Board of Immigration Appeals ("BIA") that affirmed the order of an Immigration Judge ("IJ") denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *See In re Dharwinder Singh*, No. A 099 475 946 (B.I.A. Feb. 4, 2022), *aff'g* No. A 099 475 946 (Immigr. Ct. N.Y.C. July 9, 2018).

Following a hearing and the admission of evidence, the IJ denied Singh's application for relief on the ground that he was not credible in testifying about his flight from past persecution in India. The IJ found him not to be credible because his hearing testimony that he was attacked in India in August and November 2013 contradicted what he told a border patrol agent after he was apprehended in the United States. As summarized in a Department of Homeland Security Form I-213, Singh told the border patrol agent that he fled India in April 2013. Singh subsequently testified that he lied to the border patrol agent at the advice of the individual who smuggled him to the United States. The IJ found that Singh's explanation was unconvincing and determined that Singh was not credible. The BIA affirmed the decision of the IJ.

Singh asks us to grant his petition for review because the agency "made an erroneous credibility finding by basing it solely on [Singh's] statement to the border patrol without evaluating the

3

statements under the *Ramsameachire* standard." Petitioner's Br. 16. As Singh observes, we have previously identified factors that "the BIA should use to evaluate the reliability of both the record of [a border or] airport interview as a source of the alien's statements, and the statements themselves," and held that "[t]hese aspects of the interview *must* be deemed reliable before the BIA uses the interview to assess the alien's credibility." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir. 2004) (emphasis added).

We agree with the BIA, however, that the subsequent enactment by Congress of the REAL ID Act established a statutory "presumption that interviews of this nature are proper to consider in an adverse credibility determination." *Matter of J-C-H-F-*, 27 I. & N. Dec. 211, 215 (BIA 2018). That presumption displaced the contrary presumption on which *Ramsameachire* relied: that a border or airport interview is not proper to consider in an adverse credibility determination unless it "bears sufficient indicia of reliability to warrant its consideration by the agency." *Ming Zhang v. Holder*, 585 F.3d 715, 725 (2d Cir. 2009) (describing the *Ramsameachire* standard). Because "the REAL ID Act was enacted after the Second Circuit's decision in *Ramsameachire*," the agency correctly recognized that it must apply the statutory standard of the REAL ID Act under 8 U.S.C. § 1158(b)(1)(B)(iii), which requires it to "assess the accuracy and reliability of the interview based on the totality of circumstances," and is "not required to undertake an inquiry into the reliability of initial interviews with Border Patrol agents using specifically enumerated factors" from earlier judicial precedent. *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215 (internal quotation marks omitted).

Singh further argues that the agency "failed to take into account that [Singh] was in fact under duress when he made statements to the border patrol in his Form I-213" and that, "[b]y virtue of *Matter of*

*Barcenas*, the IJ was precluded from using [Singh's] border patrol statements to hold him incredible." Petitioner's Br. 16 (citing *Matter of Barcenas*, 19 I. & N. Dec. 609 (BIA 1988)). This argument fails. Singh did not claim before the agency—and he does not argue here—that he was under any duress from government officials at his border interview. The IJ considered and rejected Singh's contention that he made the statements in the border interview while under duress from his smuggler. The BIA identified no error in the IJ's finding, noting that Singh could not "explain the means by which the smuggler exerted duress on him." Cert. Admin. R. 5. Because the record does not compel a contrary conclusion regarding the purported duress, that factual determination is "conclusive." 8 U.S.C. § 1252(b)(4)(B). And because Singh did not establish that the "Form I-213 contains information that is incorrect or was obtained by coercion or duress," the form was "inherently trustworthy and admissible as evidence to prove alienage and deportability." *Matter of Barcenas*, 19 I. & N. Dec. at 611. We deny the petition for review.

## BACKGROUND

On December 31, 2013, Singh entered the United States near San Luis, Arizona, without valid entry documents and was placed in removal proceedings. On December 23, 2014, Singh applied for asylum, withholding of removal, and CAT relief, claiming that he had suffered past persecution in India on account of his political opinion.

## I

Shortly after being apprehended near the Mexico border, a border patrol agent interviewed Singh at the Yuma Border Patrol Station. Singh provided a detailed account of his eight-month journey to the United States. He stated that he left his village "on April 21, 2013," and traveled to New Delhi, where he met a man named

5

"Jagdeep Kumar" who arranged for Singh's travel to the United States. Cert. Admin. R. 105. He stayed with Kumar for one week before flying to Dubai, where a man named "Boss" took him to a hotel. Singh stayed in Dubai for fifteen to twenty days before flying to Managua, Nicaragua, where a man named "Eleven" sheltered Singh in his home for three months. From Nicaragua, Singh flew to Guatemala, where he joined three Chinese men who accompanied him to Mexico. Singh traveled by bus and by car through Mexico until he arrived at a house near the border. He stayed in the house for twenty days before he walked across the border into Arizona.

In December 2014, Singh filed his application for asylum. In his personal statement, he provided a different account of how he reached the United States. Singh wrote that "[i]n December 2013 I left India with the help of an agent. On December 31, 2013 I entered the United States without proper inspection." *Id.* at 507.[1]

At his hearing before the IJ in July 2018, Singh also provided an account of his journey to the United States that differed from his border interview. Singh testified that he left India in December 2013 and arrived in the United States later that month. *See* Cert. Admin. R. 69-70. He testified that he flew from Delhi to "Holland," where he "[s]tayed on the aircraft" before continuing to Cuba. *Id.* at 87-90. He remained in Cuba for "a little bit more than ten days" before traveling to Mexico, where he remained for "[f]ourteen, fifteen days." *Id.* at 90.

Singh testified about why he left India. He said that he has been a member of the Akali Dal Mann party since June 2011. In India, the Akali Dal Mann party advocates for a separate Sikh state. Singh was

---

[1] "Agent" in Singh's account refers to his smuggler, not to a law enforcement officer.

an active member of the party and attended meetings, rallies, and demonstrations.

In his testimony, Singh claimed that he was attacked by members of the rival Akali Dal Badal party on two occasions. The first attack occurred in August 2013. Members of the Akali Dal Badal party drove up in a car and pulled Singh from his motorcycle. The rival party members beat Singh with "wooden sticks" and "told [him] to leave Akali Dal Mann party and join Akali Dal Badal party." *Id.* at 506. Singh claimed that "[t]hey threatened me [that] if I continue my activities with Akali Dal Mann party they will kill me or will kill me by police in [a] fake encounter." *Id.* Singh attempted to report the assault to the police, but the police accused him of fabricating the incident. *See id.* at 76.[2] Singh sustained "internal injuries and some scratches on the ... legs," and a doctor treated him with "tablets," an "injection," and "ointment on the body." Cert. Admin. R. 75.

The second attack purportedly occurred in November 2013 when Singh was "coming back from the fields." *Id.* at 77. A group of approximately ten people approached him and beat him with "hockey sticks and baseball sticks" and told him to "[l]eave Akali Dal Mann party and join Akali Dal Badal party." *Id.* According to Singh, the group "took out oil from one of the vehicle[s] and they pour[ed] it on my body" and "tried to burn me up," but the group dispersed before doing so because witnesses were present. *Id.* The attackers told Singh that "if you don't stop working at … Akali Dal Mann party and

---

[2] In his credible fear interview, Singh said that after the assault, the police told him that "you're trying to false claim" and that he should "just run away." Cert. Admin. R. 547. In his asylum application, Singh did not report that he went to the police after the assault. *See id.* at 506-07. At the hearing, Singh explained that he "forgot" to tell his attorney about his interaction with the police because he "was in a lot of depression." *Id.* at 86.

… join Badal party we will burn you alive." *Id.* Singh testified that he treated his injuries at home but "policemen came to my house … and took me to the police station," where the policemen "started torturing me physical[ly] and mentally." *Id.* at 77-79.[3] Singh said that the policemen released him the next day when his "father bribed them for one hundred thousand rupees." Cert. Admin. R. 80.

## II

Following the hearing, the IJ denied relief. The IJ found that Singh had not testified credibly. The IJ based the adverse credibility determination on the inconsistency between Singh's testimony and his statements in his border interview. *See id.* at 41-42. When asked about the inconsistency, Singh explained that at the time of the border interview, he was "under depression" and "was scared" because the federal agents "took [him] two, three places." *Id.* at 91. Singh added that he "was instructed" by his smuggler that he should "not tell [the] correct thing to … anyone. It will be not good for us, and not good for you." *Id.* at 94. He said that his smuggler "told me that you don't have to tell the correct dates about your journey" and directed Singh to "not tell anything correct about us." *Id.* at 94-95.

The IJ found Singh's explanation to be unconvincing. First, the IJ did "not find any evidence that [Singh] was under duress at the time" of his border interview. *Id.* at 41. Rather, the IJ found that if Singh had repeated what his smuggler told him to say, that would "indicate[] a willingness to lie at the direction of others," which

---

[3] In his asylum application, Singh said that the policemen urinated on him and electrocuted him. He claimed that while he was being beaten by the police, "the Akali Dal Badal member[s] were sitting there and drinking coca cola." Cert. Admin. R. 507. The policemen purportedly told him that "you have not joined the party and we are going to take your life." *Id.* at 547.

undermined his credibility generally. *Id.* Second, "the account that he apparently gave to border patrol agents as related in the Form I-213 is [a] very detailed and specific account," which "means either that he fabricated the account … or that it reflects what actually occurred on his journey to the United States." *Id.* at 41-42. "[N]either" possibility "enhances his credibility." *Id.* at 42.

The IJ observed that Singh's "application was filed after the enactment of the Real ID Act of 2005. And therefore, the credibility provisions of the act govern this case. And under the act I am to apply the totality of the circumstances test in making a credibility determination." *Id.* Under that test, the IJ explained, "I may consider the applicant's demeanor, the plausibility of his account, and any inconsistencies and statements without regard to whether or not they go to the heart of the asylum claim." *Id.* On such totality review, the IJ determined that "the inconsistency clearly goes to the heart of the asylum claim" and "goes to Respondent's willingness to be truthful and honest in his dealings with U.S. Government Officials." *Id.*

The IJ considered evidence that Singh introduced to corroborate his hearing testimony but accorded "diminished weight" to statements from parties not subject to cross-examination or who had an interest in Singh remaining in the United States. *Id.* These statements—all written within two months of Singh's hearing before the IJ on July 9, 2018—included a letter from an official of the Akali Dal Mann party dated May 25, 2018; a letter from Singh's father dated June 5, 2018; and notes from a doctor in India, each dated June 8, 2018, stating that Singh was treated in August and November 2013.

Having determined that Singh failed credibly to establish past persecution, the IJ additionally determined that he did not establish a well-founded fear of future persecution. The IJ considered late-filed

9

photographs purporting to show Singh participating in political demonstrations in the United States, but he concluded that Singh had failed to show that his participation was known to the Indian government or that, even assuming his participation was known, the Indian government would respond to that participation with persecution.

Singh appealed to the BIA on the ground that the IJ had erroneously relied on the border interview to make an adverse credibility finding. In his brief to the BIA, he explained that "statements made to the border patrol by the respondent 'warrant [the] close examination called for by *Ramsameachire*.'" *Id*. at 15 (quoting *Ming Zhang*, 585 F.3d at 724). He enumerated the *Ramsameachire* factors for evaluating the reliability of a border interview and argued that, because the IJ failed to consider those factors, "the IJ made an erroneous credibility finding by basing it solely on respondent's statement to the border patrol without evaluating the statements under the *Ramsameachire* standard." *Id.* at 16.

Additionally, Singh argued that "[t]he IJ failed to take into account that the respondent was in fact under duress when he made statements to the border patrol in his Form I-213" and this failure rendered the Form I-213 inadmissible under BIA precedent. *Id.* (citing *Matter of Barcenas*, 19 I. & N. Dec. 609). Under that precedent, a Form I-213 "is inherently trustworthy and admissible as evidence to prove alienage and deportability" only "[a]bsent any indication that a Form I-213 contains information that is incorrect or was obtained by coercion or duress." *Matter of Barcenas*, 19 I. & N. Dec. at 611.

The BIA rejected these arguments in an opinion dated February 4, 2022. First, the BIA explained that "consistent with the REAL ID

Act, which was enacted after *Ramsameachire*, Immigration Judges 'should assess the accuracy and reliability of the interview based on the totality of the circumstances, rather than relying on any one factor among a list or mandated set of inquiries.'" Cert. Admin. R. 5 (quoting *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215). "Under the REAL ID Act, there is a presumption that interviews of this nature are proper to consider in an adverse credibility determination," so "[i]n assessing the interview, we consider the totality of the circumstances presented, based on the evidence presented and the arguments raised by the parties." *Id.* at 4 (quoting *Matter of J-C-H-F-*, 27 I. & N. Dec. at 214-15).

Second, although Singh claimed that he was under duress from the smuggler during the border interview, the IJ "did not clearly err in rejecting the respondent's explanation." *Id.* at 5. Although Singh testified "that he was scared," he "has not sufficiently explained how or why the smuggler was exerting duress on him such that the respondent gave a false account of his travels." *Id.* Even assuming that Singh's "explanation is plausible," such "mere plausibility is not sufficient to establish that the Immigration Judge clearly erred in rejecting this explanation." *Id*. at 6; *see Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Because Singh's "statement at the border" describing "[a]n April 2013 departure from India would preclude [him] from establishing that he was persecuted later that year in that country," it amounted to "a statement against … his interest in establishing … his eligibility for asylum. The record thus plausibly supports viewing this inconsistency as undercutting the respondent's claim to credibly be a refugee." Cert. Admin. R. 6. The BIA dismissed Singh's appeal, and Singh petitioned this court for review of its decision.

## LEGAL STANDARDS

"When the BIA issues an opinion, the opinion becomes the basis for judicial review of the decision of which the alien is complaining." *Bhagtana v. Garland*, 93 F.4th 592, 593 (2d Cir. 2023) (internal quotation marks omitted). "When the decision of the BIA is consistent with the decision of the IJ, we may consider both decisions 'for the sake of completeness.'" *Singh v. Garland*, 11 F.4th 106, 112 (2d Cir. 2021) (quoting *Wangchuck v. DHS*, 448 F.3d 524, 528 (2d Cir. 2006)). Because Congress has specified that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B), we review the agency's decision for "substantial evidence" and "must defer to the factfinder's findings based on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Majidi v. Gonzales*, 430 F.3d 77, 81 (2d Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"The scope of review 'under the substantial evidence standard is exceedingly narrow, and we will uphold the BIA's decision unless the petitioner demonstrates that the record evidence was so compelling that no reasonable factfinder could fail to find him eligible for relief.'" *Singh*, 11 F.4th at 113 (quoting *Mu Xiang Lin v. DOJ*, 432 F.3d 156, 159 (2d Cir. 2005)). "By contrast, we review legal conclusions de novo." *Id.*

The Secretary of Homeland Security or the Attorney General "may grant asylum to an alien who has applied for asylum … if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee," meaning that "race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant" in his

or her country of nationality. 8 U.S.C. § 1158(b)(1); *see also* 8 C.F.R. § 1208.13(b). Even without a grant of asylum, the Attorney General must withhold from removing an alien to a particular country "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The regulations implementing the CAT further provide that removal will be withheld or deferred if the applicant establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

## DISCUSSION

In his petition for review, Singh renews his argument that the agency "made an erroneous credibility finding by basing it solely on [Singh's] statement to the border patrol without evaluating the statements under the *Ramsameachire* standard." Petitioner's Br. 16. He further argues that the agency "failed to take into account that [Singh] was in fact under duress" from the smuggler "when he made statements to the border patrol in his Form I-213" and that, "[b]y virtue of *Matter of Barcenas*, the IJ was precluded from using [Singh's] border patrol statements to hold him incredible." *Id.*

Singh is correct that, in cases arising before the effective date of the REAL ID Act, our court treated consideration of the *Ramsameachire* factors as a mandatory procedural requirement whenever the agency relied on a border or airport interview to make an adverse credibility determination. *See infra* note 5. We agree with the BIA, however, that the REAL ID Act establishes "a presumption that interviews of this nature are proper to consider in an adverse credibility determination." *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215. By contrast,

13

*Ramsameachire* relied on the opposite presumption: that a border or airport interview is not proper to consider in an adverse credibility determination unless it "bears sufficient indicia of reliability to warrant its consideration by the agency." *Ming Zhang*, 585 F.3d at 725 (describing the *Ramsameachire* standard). Because "the REAL ID Act was enacted after the Second Circuit's decision in *Ramsameachire*," the agency must apply the statutory standard of the REAL ID Act under 8 U.S.C. § 1158(b)(1)(B)(iii), which requires it to "assess the accuracy and reliability of the interview based on the totality of circumstances, rather than relying on any one factor among a list or mandated set of inquiries." *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215. In other words, the agency is not required to forgo consideration of a border interview based on "specifically enumerated factors" such as those identified in *Ramsameachire. Id.* (quoting *Ye v. Lynch*, 845 F.3d 38, 44 (1st Cir. 2017)). Rather, the agency properly considers the totality of the circumstances—which might include the *Ramsameachire* factors as the factfinder deems relevant—in deciding what weight, if any, to give statements made in a border interview.

As we have previously held, "our previous holdings regarding the standards governing review of credibility findings by IJs remain good law with regard to asylum applications filed before May 11, 2005"—the effective date of the REAL ID Act—while "[a]sylum applications filed after May 11, 2005 would be governed by the standards established in 8 U.S.C. § 1158(b)(1)(B)(iii)." *Liang Chen v. U.S. Atty. Gen.*, 454 F.3d 103, 108 n.3 (2d Cir. 2006) (citations omitted).

Nevertheless, the agency "should address any arguments raised regarding the accuracy and reliability of the interview and explain why the arguments are or are not persuasive." *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215. In this case, the agency considered and rejected Singh's argument that he made the statements in the border

14

interview while under duress from the smuggler who told him not "to tell the correct dates about your journey" because doing so would "not [be] good for you." Cert. Admin. R. 94. Nothing in the record shows that Singh understood these instructions as conveying threats that forced him to lie rather than advice about how lying might best secure entry into the United States. Because the record does not compel the conclusion that Singh's statements in the border interview were made under duress, we conclude that the adverse credibility determination was supported by substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B).

## I

When *Ramsameachire* was decided in 2004, no statute governed the IJ's authority to make an adverse credibility determination. Accordingly, we and other circuits developed judge-made standards for how such determinations could be made.[4] We said that a border or "airport interview is an inherently limited forum for the alien to express the fear that will provide the basis for his or her asylum claim, and the BIA must be cognizant of the interview's limitations when using its substance against an asylum applicant." *Ramsameachire*, 357 F.3d at 179. We identified factors that "the BIA should use to evaluate the reliability of both the record of the [border or] airport interview as

---

[4] *See* H.R. Rep. No. 109-72, at 161 (2005) (Conf. Rep.) ("As there are no explicit evidentiary standards for granting asylum in the INA, standards for determining the credibility of an asylum applicant and the necessity for evidence corroborating an applicant's testimony have evolved through the case law of the Board of Immigration Appeals (BIA) and federal courts. Because these standards are not consistent across federal appellate courts, different results have been reached in similar cases, depending on the court that hears the case.").

a source of the alien's statements, and the statements themselves." *Id.* at 180. We enumerated the factors as follows:

> First, a record of the interview that merely summarizes or paraphrases the alien's statements is inherently less reliable than a verbatim account or transcript. Second, similarly less reliable are interviews in which the questions asked are not designed to elicit the details of an asylum claim, or the INS officer fails to ask follow-up questions that would aid the alien in developing his or her account. Third, an interview may be deemed less reliable if the alien appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or other coercive experiences in his or her home country. Finally, if the alien's answers to the questions posed suggest that the alien did not understand English or the translations provided by the interpreter, the alien's statements should be considered less reliable.

*Ramsameachire*, 357 F.3d at 180 (internal quotation marks and citations omitted). Moreover, we held that "[t]hese aspects of the interview *must* be deemed reliable before the BIA uses the interview to assess the alien's credibility." *Id.* (emphasis added). We later extended this requirement from border and airport interviews to credible fear interviews because "credible fear interviews are more similar to airport interviews than asylum interviews and therefore warrant the close examination called for by *Ramsameachire.*" *Ming Zhang*, 585 F.3d at 724. We treated consideration of the factors as a mandatory procedural requirement and therefore vacated agency decisions that

16

relied on such interviews without considering the *Ramsameachire* factors.[5]

Congress subsequently adopted a statutory standard that governs adverse credibility determinations in the immigration context. The REAL ID Act specified, as relevant here, that IJs "[c]onsidering the totality of circumstances, and all relevant factors, *may* base a credibility determination" on:

> the consistency between the applicant's … written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record … and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or

---

[5] *See, e.g.*, *Zhen Hui Ye v. DOJ*, 159 F. App'x 243, 245 (2d Cir. 2005) (vacating the agency decision because "the IJ considered Ye's airport interview" but "did not explain whether she examined the airport interview under the factors laid out in *Ramsameachire*" and explaining that, "[i]n making her credibility determination, the IJ must explain whether she examined the airport interview under the factors laid out in *Ramsameachire*"); *Yu Qiao Wang v. Gonzales*, 190 F. App'x 20, 23 (2d Cir. 2006) (concluding that "the IJ erred by using Wang's airport interview to assess his credibility" because "[t]he IJ did not explain whether it did[] in fact examine the airport interview under the factors laid out in *Ramsameachire*") (footnote omitted); *Hui Mei Li v. BIA*, 204 F. App'x 985, 987 (2d Cir. 2006) ("[T]o the extent that the BIA relied on Li's airport interview when it adopted and affirmed the IJ's credibility decision, such reliance was inappropriate because the BIA failed to evaluate the reliability of the airport interview.") (citing *Ramsameachire*, 357 F.3d at 180).

> falsehood goes to the heart of the applicant's claim, or
> any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii) (emphasis added).

This statutory standard displaces the judge-made standards that had previously been developed.[6] The permissive language of § 1158(b)(1)(B)(iii) that authorizes the IJ to rely on any inconsistency in the record overrides prior case law that required the agency to

---

[6] The REAL ID Act abrogated case law holding that "[a]n adverse credibility finding must be based on issues that go to the heart of the applicant's claim." *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004); *see also Kondakova v. Ashcroft*, 383 F.3d 792, 796 (8th Cir. 2004) ("While minor inconsistencies and omissions will not support an adverse credibility determination, inconsistencies or omissions that relate to the basis of persecution are not minor but are at the heart of the asylum claim.") (internal quotation marks omitted); *Singh v. Ashcroft*, 362 F.3d 1164, 1171 (9th Cir. 2004) ("Contrary to our precedent, the BIA did not explain why this omission, assuming one exists, is significant or goes to the heart of Singh's asylum claim."); *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003) (holding that inconsistencies that "do not concern the basis for the claim of asylum or withholding, but rather matters collateral or ancillary to the claim," cannot "form the sole basis for an adverse credibility finding"). The sponsor of the REAL ID Act explained that the Act overrode these judge-made requirements because "the ninth circuit is preventing immigration judges from denying asylum claims when it is clear that the alien is lying." 151 Cong. Rec. H549 (daily ed. Feb. 10, 2005) (statement of Rep. Sensenbrenner). We have explained that "our previous holding that an IJ may not base an adverse credibility determination on inconsistencies and omissions that are 'collateral or ancillary' to an applicant's claims has been abrogated by the amendments to the statutory standard imposed by the REAL ID Act. For cases filed after May 11, 2005, the effective date of the Act, an IJ may rely on *any* inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible." *Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008) (citation omitted).

apply a judge-made test before relying on border, airport, or credible fear interviews in the record. *See Ming Zhang*, 585 F.3d at 721-25; *Ramsameachire*, 357 F.3d at 179-80. As the BIA has explained, the REAL ID Act establishes "a presumption that interviews of this nature are proper to consider in an adverse credibility determination." *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215. *Ramsameachire*, however, relied on the opposite presumption: that a preliminary interview is not proper to consider in an adverse credibility determination unless it "bears sufficient indicia of reliability to warrant its consideration by the agency." *Ming Zhang*, 585 F.3d at 725.

Recognizing that the statutory standard must govern, we have held that "our previous holdings regarding the standards governing review of credibility findings by IJs remain good law with regard to asylum applications filed before May 11, 2005"—the effective date of the REAL ID Act—while "[a]sylum applications filed after May 11, 2005 would be governed by the standards established in 8 U.S.C. § 1158(b)(1)(B)(iii)." *Liang Chen*, 454 F.3d at 108 n.3 (citations omitted). Accordingly, the BIA correctly decided in this case that, "consistent with the REAL ID Act, which was enacted after *Ramsameachire*, Immigration Judges should assess the accuracy and reliability of the interview based on the totality of circumstances" under 8 U.S.C. § 1158(b)(1)(B)(iii) "rather than relying on any one factor among a list or mandated set of inquiries" from case law predating the Act. Cert. Admin. R. 5 (internal quotation marks omitted).

## A

In adopting the REAL ID Act, "Congress has carefully circumscribed judicial review of BIA decisions" by expressly affording IJs discretion to reach adverse credibility determinations on any inconsistency, inaccuracy, or falsehood in the record—subject to

19

review for substantial evidence—and effectively precluding courts from requiring a preliminary consideration of judge-made factors before relying on inconsistencies in border interviews. *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021). It is well established that "a reviewing court is 'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Id.* (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978)).

The Supreme Court has emphasized that we do not "hear direct appeals from Article II executive agencies." *Id.* at 367. Rather, we follow a "collateral review process Congress has prescribed, initiating a new action in the federal courts," in which the agency is the respondent. *Id*. A petition for review is therefore not "an 'appeal' akin to that taken from the district court to the court of appeals, or from the IJ to the BIA." *Id.* We are authorized to provide remedies against the agency as a party to the dispute but do not oversee it as an inferior judicial tribunal. *See Vera Punin v. Garland*, 108 F.4th 114, 125 (2d Cir. 2024) ("Agencies are not courts.") (alteration omitted) (quoting *Garcia v. Garland*, 64 F.4th 62, 70 (2d Cir. 2023)).

Congress provided that an IJ "may" make an adverse credibility determination based on inconsistent statements in the record. The IJ did so here based on the inconsistencies between the border interview and the hearing testimony. We must accept the IJ's factfinding, including an adverse credibility determination, as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "We defer therefore to an IJ's credibility determination unless, from the totality of the circumstances, it is plain that no reasonable fact-finder could make such an adverse credibility ruling." *Xiu Xia Lin*, 534 F.3d at 167. That is the basis on which we may decide that an adverse credibility

determination was erroneous—but the record here does not meet that standard.

**B**

Other circuits have reached the same conclusion in light of the REAL ID Act. In *Ye v. Lynch*, the First Circuit considered a petition for review challenging the denial of immigration relief following an adverse credibility determination based on inconsistencies between a border interview and testimony at the asylum hearing. 845 F.3d at 41-42. The petitioner "argue[d] that the border interview was unreliable and urge[d]" the First Circuit "to assess its reliability under the Second Circuit standard as set forth in *Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir. 2004)." *Id*. at 44. The First Circuit rejected that request:

> This Circuit does not require IJs to undertake an inquiry into the reliability of initial interviews with Border Patrol agents using specifically enumerated factors. … Section 101(a)(3) of the REAL ID Act outlines how IJs must make credibility determinations, and was added following the decision in *Ramsameachire*. Section 101(a)(3) specifically allows IJs to consider "the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made)." … [T]he BIA's reliance on the [interview] was reasonable and supported by substantial evidence.

*Id*. at 44-45 (citations omitted).

The Fifth Circuit has similarly considered the argument that a credible fear interview was "unreliable under the factors set forth in *Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir. 2004)," and that

21

"the BIA and IJ erred by failing to specifically evaluate the reliability of [the credible fear interview] under those factors before considering it in rendering an adverse credibility determination." *Avelar-Oliva v. Barr*, 954 F.3d 757, 764 (5th Cir. 2020). The Fifth Circuit concluded that the agency had not erred. While the Fifth Circuit "has cited the factors set out in *Ramsameachire*" in a case applying the substantial evidence standard to uphold an adverse credibility determination, it has "not expressly adopted a rule requiring consideration of specific factors in assessing the reliability of a [credible fear interview]." *Id.* at 765 (citing *Singh v. Sessions*, 880 F.3d 220, 226 (5th Cir. 2018)).

## C

Importantly, the BIA has also addressed this question.[7] In *Matter of J-C-H-F-*, the BIA addressed the status of *Ramsameachire* following the adoption of the REAL ID Act. *See* 27 I. & N. Dec. at 212-13. The BIA concluded that "although the factors listed in *Ramsameachire* are proper considerations for assessing the reliability of an interview, the Immigration Judge should assess the accuracy and reliability of the interview based on the totality of circumstances, rather than relying on any one factor among a list or mandated set of inquiries." *Id.* at 215. The BIA emphasized that under the REAL ID Act, "there is a presumption that interviews of this nature are proper to consider in an adverse credibility determination." *Id.* And the BIA expressly agreed with the First Circuit:

---

[7] *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) ("[I]n an agency case in particular, the reviewing court will go about its task with the agency's body of experience and informed judgment, among other information, at its disposal. An agency's interpretation of a statute … may be especially informative to the extent it rests on factual premises within the agency's expertise.") (internal quotation marks, alteration, and citation omitted).

In *Ye,* the First Circuit rejected the argument that it should adopt these factors. Noting that the REAL ID Act was enacted after the Second Circuit's decision in *Ramsameachire*, the court declined to employ a checklist or require specific dispositive considerations that must be addressed. The First Circuit stated that Immigration Judges are not required "to undertake an inquiry into the reliability of initial interviews with Border Patrol agents using specifically enumerated factors." We agree.

*Id.* (citations omitted). Thus, in the BIA's view, while an IJ "should address any arguments raised regarding the accuracy and reliability of the interview and explain why the arguments are or are not persuasive," he or she is "not required" to employ any "specifically enumerated factors." *Id*.

Consistent with this precedent, an IJ may consider the factors described in *Ramsameachire* when making an adverse credibility determination in light of "the totality of the circumstances." 8 U.S.C. § 1158(b)(1)(B)(iii). And a reviewing court might consider similar factors when deciding whether substantial evidence supports the agency's decision. *See* 8 U.S.C. § 1252(b)(4)(B). But such consideration by the reviewing court may occur only as part of applying the substantial evidence standard. "The only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Ming Dai*, 593 U.S. at 368. And "a reviewing court must uphold [its] decision unless a reasonable adjudicator would have been compelled to reach a different conclusion." *Id.* at 369. A reviewing court may not police the agency's compliance with "judge-made procedural requirements … that Congress has not prescribed and the Constitution does not compel." *Id.* at 365.

For that reason, Singh is incorrect that the agency erred by relying on a border interview to make an adverse credibility finding without considering the *Ramsameachire* factors. The agency is "not required to undertake an inquiry into the reliability of initial interviews with Border Patrol agents using specifically enumerated factors." *Matter of J-C-H-F-*, 27 I. & N. Dec. at 215 (internal quotation marks omitted). To prevail on a petition for review, the petitioner cannot rely on the agency's failure to conduct a *Ramsameachire* review before considering a border interview in assessing credibility. Rather, the petitioner must show that, considering the record as a whole, the adverse credibility determination was unsupported by substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B). Under the substantial evidence standard, we must "defer … to an IJ's credibility determination unless, from the totality of the circumstances, it is plain that no reasonable fact-finder could make such an adverse credibility ruling." *Xiu Xia Lin*, 534 F.3d at 167. Whether a reasonable fact-finder could do so is the "only question" before us. *Ming Dai*, 593 U.S. at 368.

## II

We conclude that substantial evidence supported the adverse credibility determination in this case. Singh's statement in his border interview that he "left his village on April 21, 2013," Cert. Admin. R. 105, contradicted his testimony at the hearing that he left India in "December 2013," *id.* at 69. And he provided inconsistent accounts of his travel from India to the United States between the two statements.

Singh does not dispute the inconsistencies. In fact, he acknowledges that his account in the border interview "logically nullif[ies] his asylum claim." Petitioner's Br. 20. Instead, Singh argues that the agency failed to resolve the inconsistencies in his favor by recognizing that he was "depressed and scared and under duress"

24

during the border interview. *Id.* at 17. But the agency considered and rejected Singh's explanation that he lied during the border interview based on pressure from the smuggler. The IJ found that Singh was not under duress from the smuggler at the time of the border interview and, in any event, Singh's lying based on the smuggler's instructions "indicates a willingness to lie at the direction of others" that undermines his credibility. Cert. Admin. R. 41. In upholding the IJ's decision, the BIA noted that Singh could not "explain the means by which the smuggler exerted duress on him." *Id.* at 5. Because Singh did not establish that his "Form I-213 contains information that is incorrect or was obtained by coercion or duress," the form was sufficiently "trustworthy and admissible as evidence" of inconsistencies that undermined Singh's credibility and thereby could "prove … deportability." *Matter of Barcenas*, 19 I. & N. Dec. at 611.

As the BIA observed, the "mere plausibility" of Singh's explanation for the inconsistencies would not be enough to entitle him to relief. Cert. Admin. R. 6. The conclusion applies with even more force under the substantial evidence standard applicable here: "[a] petitioner must do more than offer a plausible explanation for his inconsistent statements to secure relief; he must demonstrate that a reasonable fact-finder would be *compelled* to credit his testimony." *Majidi*, 430 F.3d at 80 (internal quotation marks omitted). Singh has not made that showing. The IJ was not compelled to conclude that the lengthy and detailed account of his travels from India to the United States that Singh provided in his border interview was false, much less that the account resulted from fear, depression, or the duress of the smuggler. Even if that account were false, the IJ still would not be compelled to credit Singh's completely different account in his hearing testimony.

Because Singh cannot "demonstrate[] that the record evidence was so compelling that no reasonable factfinder could fail to find" that Singh was credible despite the inconsistencies between the border interview and his testimony, *Singh*, 11 F.4th at 113 (quoting *Mu Xiang Lin*, 432 F.3d at 159); *Xiu Xia Lin*, 534 F.3d at 167, the adverse credibility determination is "conclusive," 8 U.S.C. § 1252(b)(4)(B).[8]

## CONCLUSION

For the foregoing reasons, we deny the petition for review.

---

[8] Moreover, the IJ was not "required" to ask Singh about the inconsistencies. Petitioner's Br. 20. The government elicited Singh's explanation for the inconsistencies during cross-examination, and an IJ need not "duplicate the questions of the government when the government has already noted testimonial flaws on cross-examination." *Zhi Wei Pang v. Bureau of Citizenship & Immigr. Servs.*, 448 F.3d 102, 110 (2d Cir. 2006). The obligation of the IJ is to "ensure that the record as a whole is adequately developed to permit her to offer specific and cogent reasons for her credibility determination." *Id.* at 117 (Raggi, J., concurring in part and concurring in the judgment).

MYRNA PÉREZ, *Circuit Judge*, concurring in the judgment:

Petitioner Dharwinder Singh admitted to the Immigration Judge ("IJ") that he intentionally lied to a border patrol agent when he arrived in the United States, on the advice of the person who smuggled him into the country. Of course, an IJ is permitted to consider undisputed, uncoerced, intentional lies to federal agents in determining the credibility of an applicant for immigration relief. Accordingly, I concur in the judgment.

I write separately, however, because neither *Ramsameachire v. Ashcroft*, 357 F.3d 169 (2d Cir. 2004), nor any other precedent of this Court, is in conflict with this panel's disposition. This case could have been decided by a non-precedential summary order.

## I.

In affirming the IJ's decision, the Board of Immigration Appeals ("BIA"), correctly applied our longstanding precedent, including *Ramsameachire*. Petitioner then distorted *Ramsameachire* to fashion a rule that has never been endorsed by a precedential decision of this Court. The majority opinion correctly rejects Petitioner's argument because it is inconsistent with both the REAL ID Act of 2005 and with our existing precedent. Before today, the guidance we provided in *Ramsameachire* and its progeny was consistent with the REAL ID Act, and after

today, those cases continue to provide the guideposts for certain credibility determinations in removal proceedings under the Act.

To understand why, it is important first to clarify what *Ramsameachire* says. Our holding comprised four components that, in combination, have guided this Court and the agency for decades. *First*, we enumerated four factors "that the BIA should use to evaluate the reliability of both the record of [a border] interview . . . and the statements themselves." *Ramsameachire*, 357 F.3d at 180; *see* Maj. Op. at 16 (quoting factors). *Second*, we stated that the purpose of "[e]xamining the interview in light of these factors" was to "focus the agency's inquiry on whether the record of the interview accurately reflects the alien's statements, whether the alien had a full opportunity to express him- or herself, and whether the alien's statements are likely to reflect his or her actual beliefs and fears." *Ramsameachire*, 357 F.3d at 180. *Third*, we stated, "[t]hese aspects of the interview must be deemed reliable before the BIA uses the interview to assess the alien's credibility." *Id*. *Fourth*, we stated that the "factors described above are not exhaustive," but "they provide the analytical framework for assessing the reliability of [a border] interview." *Id.*

In context, the import of these four statements is clear. The three "aspects of the interview" that "must be deemed reliable" are those enumerated in the prior

2

sentence: The record must be accurate, the non-citizen must have had a chance to articulate his claim, and the non-citizen's statements must be probative. The four non-exhaustive, enumerated "factors" are simply examples of the kinds of things an adjudicator can and should consider in making those reliability determinations.

Petitioner argues instead that *Ramsameachire* imposes its four "factors" as a rigid checklist that "must be" satisfied in every case, but to arrive at that reading one must chop up, rearrange, and ignore portions of *Ramsameachire*'s holding. *See* Maj. Op. at 16 (quoting the first and third components above and ignoring the second and fourth). On Petitioner's account, which the majority opinion accepts, this Court created a "presumption[] that a border or airport interview is not proper to consider," *id* at 19, even though *Ramsameachire* itself is premised upon the proposition that "the [border] interview . . . will usually provide a reliable record of the alien's basis for seeking asylum." 357 F.3d at 179. In sum, *Ramsameachire* itself refutes Petitioner's argument, and this case could have been resolved without breaking any new ground.

II.

As the majority opinion notes, shortly after we decided *Ramsameachire*, Congress enacted the REAL ID Act. For asylum, withholding of removal, and

3

other forms of relief, the Act clarified the burden of proof, the role of corroborating evidence, and the proper considerations in making a credibility determination. *See* REAL ID Act of 2005, Pub. L. No. 109-13, § 101, 119 Stat. 231, 302–06 (codified in relevant part at 8 U.S.C. §§ 1229a(c)(4), 1231(b)(3)(C), 1158(b)(1)(B)). As relevant to this appeal, the Act permits an IJ to base an adverse credibility finding upon any inconsistent statement or omission that a non-citizen or a witness makes, regardless of whether the inconsistency involves "the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii).[1] As the majority opinion explains, Maj. Op. at 18 n.6, that aspect of the Act abrogated our prior case law insofar as we had held that an IJ should consider "an inconsistency, inaccuracy, or falsehood [only if it] goes to the heart of the applicant's claim." *See Hong Fei Gao v. Sessions*, 891 F.3d 67, 77 (2d Cir. 2018) (quoting § 1158(b)(1)(B)(iii); *see also Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008) (acknowledging this abrogation).

But whether or not a statement goes to the heart of a non-citizen's claim, nothing in the statute abrogates the proper method for assessing its reliability. To the contrary, the REAL ID Act *permits* IJs to make adverse credibility findings on

---

[1] For ease of reference, though my observations apply equally to the different forms of immigration relief for which the Act prescribes a standard for adverse credibility determinations, in the remainder of this concurrence, I cite to § 1158(b)(1)(B) only, which governs asylum claims.

a variety of bases, including based on any inconsistent statement or omission by a non-citizen, regardless of whether the inconsistency involves "the heart of the applicant's claim." § 1158(b)(1)(B)(iii). But the REAL ID Act *requires* IJs, in making such determinations, to do so "[c]onsidering the totality of the circumstances, *and all relevant factors*." *Id.* (emphasis added). More specifically, the Act *permits* IJs to base credibility determinations on, among other things, "the consistency between the applicant's or witness's written and oral statements," but it *requires* IJs to do so "*considering the circumstances under which the statements were made*." *Id*. (emphasis added). These aspects of the statute requiring assessment of reliability are phrased as mandatory, not permissive, instructions to factfinders. *See* H.R. Rep. No. 109–72, at 167 (2005) ("[A]lthough [§ 1158(b)(1)(B)(iii)] would allow an adjudicator to base an adverse credibility determination on any of the factors set forth therein, such a determination must be reasonable and take into consideration the individual circumstances of the specific witness and/or applicant.").

The upshot is simple. If a particular *Ramsameachire* factor is irrelevant or undisputed in a given case, then of course the IJ can ignore it. That has always been true.[2] But if one of the factors laid out in *Ramsameachire* is one of the "relevant

---

[2] *See Mohammed v. Garland*, No. 19-66, 2021 WL 3085141, at *1 (2d Cir. July 22, 2021) ("Although we have cautioned against reliance on airport or border interviews as a basis for an adverse credibility

5

factors" or "circumstances under which the statements were made" that the REAL ID Act commands the IJ to consider, then the IJ is not free to ignore it. § 1158(b)(1)(B)(iii). A contrary rule would conflict far more seriously with the statute Congress enacted than *Ramsameachire* ever did. Of course, that the IJ must *consider* the relevant *Ramsameachire* factors does not mean the IJ must recite each one to confirm that it did so. *See Ming Zhang v. Holder*, 585 F.3d 715, 725 (2d Cir. 2009). The IJ need only make a sufficient record to enable the BIA and this Court to evaluate its findings under the applicable standards of review.

### III.

The linchpin of our role as a reviewing court is to reconcile the requirement that the agency "[c]onsider[] . . . all relevant factors," under the totality of the circumstances, with the permissive bases, including the consistency of statements made during a border interview, upon which an ultimate credibility finding may rest. *See* § 1158(b)(1)(B)(iii). We are obligated to "review the agency's factual findings, including adverse credibility determinations, under the substantial evidence standard, treating them as 'conclusive unless any reasonable adjudicator

---

determination because they 'take place immediately after an alien has arrived in the United States, often after weeks of travel, and may be perceived by the alien as coercive or threatening, depending on the alien's past experiences,' Mohammed does not dispute the reliabity [*sic*] of the record." (alteration adopted) (quoting *Ramsameachire*, 357 F.3d at 179)).

would be compelled to conclude to the contrary.'" *Xiu Xia Lin*, 534 F.3d at 165 (quoting 8 U.S.C. § 1252(b)(4)(B)); *accord* Maj. Op. at 23.  However, it would not be accurate to say that the substantial evidence standard insulates decisions based on adverse credibility determinations.  *See Hong Fei Gao*, 891 F.3d at 76 ("[T]he fact that an IJ 'has relied primarily on credibility grounds in dismissing an asylum application cannot insulate the decision from review.'" (internal quotation marks omitted) (quoting *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 335 (2d Cir. 2006))).  As this Court recently reaffirmed, when we evaluate an adverse credibility determination, "the 'unless . . . compelled' standard" imposes at least three meaningful requirements on the agency.  *Singh v. Garland*, 6 F.4th 418, 426 (2d Cir. 2021).  Specifically, it "requires that the IJ articulate 'specific' and 'cogent' reasons for finding an applicant not credible, that the reasons provided by the IJ 'be supported by reasonable, substantial and probative evidence in the record when considered as a whole,' and that they 'bear a legitimate nexus to the adverse credibility finding."  *Id.* (alterations adopted) (quoting *Hong Fei Gao*, 891 F.3d at 76–77).

The *Ramsameachire* analysis fits comfortably within that overall framework for judicial review of agency decision-making.  As discussed above, the purpose

of the *Ramsameachire* analysis is only to ensure that "the record of the interview accurately reflects" the non-citizen's statements, the non-citizen "had a full opportunity to express him- or herself," and the non-citizen's "statements are likely to reflect his actual beliefs and fears." *Ramsameachire*, 357 F.3d at 180. Thus, if one of the specific "reasons" cited by the IJ for an adverse credibility finding is an inconsistency between a non-citizen's border interview and another statement, the *Ramsameachire* factors bear directly on whether that reason is "both (1) supported substantial evidence in the record and (2) logically related to the applicant's credibility." *Singh*, 6 F.4th at 426. Far from "impos[ing] additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel," a proper understanding of *Ramsameachire* conforms the agency's decision-making to the statute. *Cf.* Maj. Op. at 20 (internal quotation marks omitted) (quoting *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021)); *cf. also id.* at 18 (describing *Ramsameachire* as imposing a "judge-made test"). It also ensures that in accordance with Congress's mandate, our review under the applicable standard remains both meaningful and properly cabined.

8

IV.

The majority opinion is therefore unnecessary to align our jurisprudence with the REAL ID Act, and it is also unnecessary even to resolve the controversy before us. Singh's border interview statements about his April 2013 departure from India, and his detailed account of months spent travelling to the United States, conflict irreconcilably with his subsequent claim that he was persecuted in India in September and November 2013. Certified Administrative Record ("CAR") at 69–70, 74–80, 105–06. To explain his inconsistency, Singh told the IJ only that he was instructed by the person who smuggled him into the country, "do not tell [the] correct thing to . . . anyone." *Id.* at 94. Singh never explained how that person placed him under "duress," and the IJ reasonably rejected that explanation, finding Singh's evident "willingness to lie at the direction of others" undermined, rather than supported, his credibility. *Id.* at 41.

Beyond his specious claim of "duress," Singh never claimed his border interview was unreliable in any relevant way. He did not assert that the record was unreliable, that he was denied an opportunity to express himself, or that he was prevented from expressing his "actual beliefs and fears." *Cf. Ramsameachire*, 357 F.3d at 180. Singh's testimony gave the IJ no reason to doubt the reliability of

9

any pertinent aspect of the interview, and no plausible reading of *Ramsameachire* required the agency to scrutinize the interview further before relying on it.

V.

Years of experience following the REAL ID Act's passage, up to and including Singh's own case, underscore how *Ramsameachire* and the Act work together in practice, and why the majority opinion's intervention is unnecessary.

In *Ming Zhang v. Holder*—which addressed an agency decision to which the REAL ID Act did not apply retroactively—we held the *Ramsameachire* factors are relevant to evaluating credible fear interviews as well as airport interviews. *See* 585 F.3d 715, 724–725 (2d Cir. 2009). If there were any doubt at that point about whether *Ramsameachire* created a rigid checklist to be followed in all cases, we clarified that the agency "need not engage in 'robotic incantations' or make any talismanic references to 'close examination' or 'special scrutiny.'" *Id.* at 725. And, even though the case was decided after the REAL ID Act's passage, we gave no indication that the analysis would change in future cases to which the Act applied.

More recently, the BIA reached virtually identical conclusions in a case with which the majority opinion appears to agree. *See Matter of J-C-H-F-*, 27 I. & N. Dec. 211 (2018); Maj. Op. 13–14, 22–24. In *Matter of J-C-H-F-*, the agency explained that

10

the Act's "broad language encompasses statements made in border and airport interviews, as long as the [IJ] takes into account any issues regarding the circumstances under which they were made." *Id.* at 213. Recognizing the Act's emphasis on the totality of the circumstances, *see* 8 U.S.C. § 1158(b)(1)(B)(iii), the BIA agreed with the First Circuit that IJs need not "employ a checklist" or cycle through a "mandated set of inquiries." *Id*. at 215. Importantly, however, the BIA acknowledged that "the factors listed in *Ramsameachire* are *proper considerations for assessing the reliability of an interview*." *Id.* (emphasis added).

In the years since, we have often recognized the continued utility of the *Ramsameachire* factors, where relevant, in innumerable, albeit non-precedential, decisions. *See, e.g., Singh v. Garland*, No. 22-6329, 2024 WL 5054850, at *1 n.1 (2d Cir. Dec. 10, 2024); *Ali v. Garland*, No. 22-6287, 2024 WL 1252983, at *2 (2d Cir. Mar. 25, 2024); *Sun v. Garland*, No. 21-6130, 2023 WL 5273786, at *2 (2d Cir. Aug. 16, 2023); *Villacorta v. Garland*, No. 21-6045, 2023 WL 2854221, at *1 (2d Cir. Apr. 10, 2023); *Smajlaj v. Garland*, No. 18-3406, 2022 WL 710892, at *1 (2d Cir. Mar. 10, 2022); *Mohammed v. Garland*, No. 19-66, 2021 WL 3085141, at *1 n.1 (2d Cir. July 22, 2021). The majority opinion takes issue with a few stray phrases, devoid of context, from a small handful of pre-REAL ID Act summary orders. *See* Maj. Op. at 17 n.5. But

11

those decisions do not compel a different understanding of *Ramsameachire*. To the extent those cases contain inartful phrasing, they are non-precedential and identify numerous other issues with the agency's decision-making. More importantly, they shed no light on the role *Ramsameachire* plays in cases governed by the Act.

Finally, in this very case, the agency explicitly reaffirmed and applied *Matter of J-C-H-F-*, and conducted just the kind of *Ramsameachire* analysis that this Court has endorsed. *See* CAR at 4–6. That is, the agency gave the *Ramsameachire* factors the weight they were due in the totality of the circumstances analysis, but did not assign them talismanic significance. It would suffice to resolve this case to say that the agency properly applied not just *Ramsameachire* and *Ming Zhang*, but also the agency's own precedent, as we generally require it to do. *See Paucar v. Garland*, 84 F.4th 71, 87 (2d Cir. 2023); *Ojo v. Garland*, 25 F.4th 152, 168 (2d Cir. 2022). Nothing more need be said to bring either the agency's decision-making or our own precedent into alignment with the requirements imposed by Congress.

*     *     *

*Ramsameachire* has always stood for the simple proposition that the agency cannot use evidence of a non-citizen's prior statements against him if that evidence is unreliable, and it has never required formulaic recitation of a list of factors to

the exclusion of other relevant considerations. *See Ramsameachire*, 357 F.3d at 180; *Ming Zhang*, 585 F.3d at 725. *Ramsameachire* highlights important considerations both for the agency—which must consider "all relevant factors" including the "circumstances under which the statements were made" under the REAL ID Act, § 1158(b)(1)(B)(iii)—and this Court—which must evaluate credibility findings to ensure they are "supported by reasonable, substantial and probative evidence," *Singh*, 6 F.4th at 426 (internal quotation marks omitted). In other words, properly understood, *Ramsameachire* occupies a vital role in evaluating the credibility of applicants for immigration relief, and neither the majority's opinion nor the REAL ID Act suggests any reason to change that. The language of the majority opinion unnecessarily muddles the proper application of this Act to the straightforward case before us. *Ramsameachire* has never allowed petitioners who, like Singh, admit that they willfully lied at their border interviews, to escape the consequences of adverse credibility determinations. For that reason, I concur in the judgment.